# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

Case No. 6:25-cv-360-GAP-UAM

DARREN HUNTER,

      Plaintiff,

    v.

NETFLIX, INC., ADAM MCKAY,
SCOTT STUBER, DAVID SIROTA,
and HYPEROBJECT
PRODUCTIONS,

      Defendants.

## DEFENDANT NETFLIX, INC.'S MOTION TO DISMISS

Defendant Netflix, Inc. ("Netflix") hereby moves to dismiss the Complaint for

failure to state a claim on which relief can be granted pursuant to Fed. R. Civ. P.

12(b)(6), for the reasons set forth herein.

## I.    INTRODUCTION

In this meritless action for copyright infringement, violations of the Lanham

Act, and various state-law claims, Plaintiff Darren Hunter alleges that Defendants'[1]

2020 film *Don't Look Up* (the "Film")—the story of adult scientists and politicians

who must stop an imminently approaching comet that ultimately wipes out most of

---

[1] Defendants are Adam McKay, Netflix, David Sirota, Hyperobject Productions ("Hyperobject"), and Scott Stuber (collectively, "Defendants"). Stuber had no involvement in the creation of the film *Don't Look Up*. The instant motion is brought solely on behalf of Netflix, which is the only Defendant that has been served.

humankind—unlawfully copied from his two self-published novels *The Million Day Forecast* ("*Forecast*") and *The Million Day Forecast and the Dark Exoplanet* ("*Exoplanet*") (collectively, the "Novels"). The Novels recount the tale of a seventeen-year-old girl who makes contact with a small, rabbit-like alien via her tablet; learns that Earth could be destroyed over 2,700 years in the future; becomes a teenage President of the United States without a popular vote; and is kidnapped by a second set of aliens and taken to an "exoplanet," where she is imprisoned but eventually rescued. In making his frivolous claims, Plaintiff improperly seeks to monopolize the uncopyrightable, abstract idea of a cataclysmic event destroying Earth. The Complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(6) for a number of reasons.

- Under Eleventh Circuit law, the works are markedly dissimilar in plot, themes, characters, setting, sequence of events, mood, and pace such that there is no substantial similarity of copyrightable expression and therefore no infringement.

- The Lanham Act claims for false advertising are barred by the Supreme Court's decision in *Dastar Corp. v. Twentieth Century Fox Film, Corp.*, 539 U.S. 23 (2003) (precluding claims for reverse passing off of intangible property).

- The state law unjust enrichment and deceptive and unfair trade practices claims are preempted by the Copyright Act of 1976, 17 U.S.C. § 301.

Because the Film and the Novels are fundamentally dissimilar, any attempt at amendment would be futile as a matter of law. The Complaint should be dismissed with prejudice under Rule 12(b)(6).

## II.    FACTUAL ALLEGATIONS[2]

### A.    *The Works at Issue*

#### 1.    Defendants and the Film *Don't Look Up*.

Adam McKay—writer and director of popular films such as *Stepbrothers*, *Anchorman*, and *The Big Short*—wrote the Film.[3] McKay and Defendant David Sirota received "story by" credits. Hyperobject, McKay's production company, produced the Film. On December 5, 2021, the Film premiered in New York City. On December 24, 2021, the Film began streaming on Netflix.

A satire of disaster movies, the Film centers around two astronomers attempting to warn humanity about an approaching comet that will destroy human civilization.[4] The impact event is an allegory for cataclysmic events like climate change, and the Film is a satire of conspiracy theories and of governmental, political, celebrity, and media indifference to impending disaster. Film.

The Film begins with the discovery of an unknown comet by Kate Dibiasky, (played by Jennifer Lawrence), a doctoral candidate in astronomy. Dibiasky's professor, Dr. Randall Mindy (played by Leonardo DiCaprio), confirms that the comet will collide with Earth in approximately six months and fourteen days, and

---

[2] As is appropriate on a motion to dismiss under Rule 12(b)(6), the summary of factual allegations comes from the face of the Complaint, material incorporated by reference therein (including the Novels and Film), and other material that may be judicially noticed. The Court may consider these materials at this stage under applicable law.

[3] Adam McKay, WIKIPEDIA, https://en.wikipedia.org/wiki/Adam_McKay (last visited Feb. 28, 2024). McKay also co-founded the website "Funny or Die" and served as head writer on the television show *Saturday Night Live. Id.*

[4] Netflix is concurrently filing a Motion to Conventionally File copies of the Film and of the Novels.

will cause global extinction. ~07:28-07:59. NASA verifies the findings, which are then presented to President Janie Orlean (played by Meryl Streep) and her Chief of Staff and son Jason Orlean (played by Jonah Hill). President Orlean and Jason are apathetic to the shocking development, so Dibiasky and Mindy leak the news to the media. ~18:03-24:43; 27:38-29:30. After both astronomers appear on a popular morning talk show hosted by Brie Evantee (played by Cate Blanchett), the news of the comet is still treated lightly, and viewers show more interest in Mindy's good looks and Dibiasky's on-air meltdown. ~36:53-41:29; 41:55-43:10.

When news of a sex scandal involving President Orlean becomes public, she tries to distract from the bad publicity by finally confirming the comet's threat and announcing a project to strike and divert it using nuclear weapons. This approach is abandoned, however, when a billionaire CEO discovers that the comet contains trillions of dollars' worth of rare-earth elements. The billionaire suggests that the White House find a way to exploit the comet commercially. ~45:45-46:20; 49:30-49:48; 50:48-54:03; 1:08:00-1:10:28, 1:12:04-1:13:57. Mindy becomes a prominent voice advocating for the comet's commercial opportunities, while Dibiasky opposes it. Mindy also has an affair with Evantee, the talk show host. ~1:14:12-1:16:52; 1:18-08-1:21:35. The world is divided between people who think the comet is a threat and those who deny the comet's existence. ~1:17:41-1:18:05; 1:21:35-1:21:49.

Once the comet becomes visible from Earth, Mindy and Dibiasky reconcile and organize a protest campaign urging people to "Just Look Up." President Orlean starts a counter-campaign telling people "Don't Look Up." ~1:35:39-1:45:09;

1:47:14-1:48:04. At the end of the film, President Orlean and other elites board a sleeper spaceship to save themselves and invite Mindy to join them. After reconciling with his wife, he instead spends his final evening with friends and family. The comet strikes, triggering a global extinction-level event, and Mindy perishes surrounded by loved ones. ~1:59:30-2:06:25.

In the middle of the movie's end credits, an additional scene shows the 2,000 people who left Earth before the comet struck, landing on an alien planet 22,740 years later. They exit their spaceship and admire the new planet's beauty. However, President Orlean is immediately killed by a bird-like predator. ~2:08:13-2:10:12. A post-credits scene back on Earth reveals that the President's son and chief-of-staff, Jason, managed to survive the impact. He records himself, declaring himself the "last man on Earth" and asking any viewers to "like and subscribe." ~2:17:12-2:17:56.

Thematically, *Don't Look Up* uses the idea of the impending comet collision to draw analogies to the world's existential crises—*e.g.*, climate change—and to critique the large-scale failure of institutions to respond to those crises, including through portraying unqualified government officials who obtain their positions through financial influence; private-tech interests that sway the government; and cable news networks that warp the public discourse.

### B.    *Hunter's Novels.*

*Forecast* was self-published in 2015. Its sequel, *Exoplanet*, was self-published in 2017. *Forecast* begins on a planet called X7gTH5, located in another galaxy, and tells the story of Srenyi, "a young member of the Quittu, a gentle race about a foot tall."

p. 2. The Quittu "resemble[] a fortuitous mix of a rabbit, beagle, and a koala with very large feet." *Id.* Srenyi's ancient ancestors came from the Centaurus, a galaxy outside the Milky Way. *Id.* Srenyi communicates via a gravitational wave with protagonist Emma Hayes through her tablet. p. 14. Emma is a seventeen-year-old honor student who lives on Earth with her parents and is still in high school. pp. 7-8, 13, 51.  Srenyi warns her that in a million days (*i.e.*, over 2,700 years), the Earth will encounter "clusters" that will destroy humanity. p. 39. He suggests that she encourage humanity to build an Einstein-Rosen bridge so that humans can transport to another planet. pp. 53-54, 106. Emma then creates a YouTube video warning humankind about the clusters but is mocked at school, eventually institutionalized at the insistence of her parents, held against her will, and sedated. pp. 52, 59, 61-62, 69. Then Srenyi's mentor, Asphar, sends a message to Earth, confirming that what Emma said in her YouTube video was true. p. 96. However, the Quittu's rivals, the Allanze—twelve-foot tall blue aliens—somehow influence many humans to oppose Emma's plan to build the Einstein-Rosen bridge. pp. 92-94. She remains imprisoned in a mental hospital until Captain Sean Somers, a supporter who once served in the Special Forces, frees her, takes her to her supporters, and informs her that the U.S. House of Representatives has elected her President of the United States. pp. 84-90, 102. Despite her inspiring speech supporting the building of the bridge to save future generations, *Forecast* ends with Emma's enemies vowing to kill her. pp. 104-07.

*Exoplanet*[5] begins with President Emma Hayes in the White House, bantering with her teenaged friends, Darci and Ranger. p. 1. ("How 'bout the both of you immediately stop being weird or I'll have the fashion police take you into custody!' 'Very funny Emma!' 'Umm, that's President Hayes if you're nasty.'"). In the next scene, Emma communicates with Srenyi, with whom she has not spoken with in some time. pp. 3-7. He warns that "[t]here is a grave threat to basic rights afoot in the galaxy." p. 7.

Emma gives her state of the union address, which is about interstellar travel and colonization of space. p. 11. Her adversary, Speaker of the House Mitch Grayson, leaps to his feet and calls her an "incompetent little moron." p. 12. The evil Dr. Soren directs Grayson to implant a tracking device into Emma as part of a kidnap plot. p. 14.

A nostalgic Emma takes a risky trip to the field near her parents' house. pp. 15-16. Syreni contacts her on her tablet and tells her to run, but she is captured and imprisoned on a dark exoplanet called Daxano. pp. 17-18, 34. While in captivity, she makes contact with another prisoner, an alien named Pepyla, who tells Emma she must escape to save humanity. pp. 32-34. War breaks out on Daxano. p. 39. Emma learns that the Allanze are behind her imprisonment. p. 41. The Allanze use

---

[5] Hunter never registered *Exoplanet* with the Copyright Office and therefore cannot sue on that Novel. *See Section IV.A. infra.* So any purported similarities between the Film and *Exoplanet* may not be considered. In addition, the Complaint treats both of Hunter's Novels as a single work, which is also inappropriate. Each work must stand alone in the infringement analysis. *See* 4 Nimmer on Copyright, § 13.03[A][3] (stating "[Copyright] Act itself" suggests favoring individual, rather than aggregate, analysis). However, because the Film and the Novels, separately or taken together, differ so starkly, Netflix will address Hunter's inappropriately combined allegations of similarity.

something called "Accordance" to control the populace through government-issued tablets. p. 55.

Back on Earth, Emma's friends and former high school teacher, Mr. Snively, are part of a resistance group opposing Accordance, which Soren and Grayson have now implemented on Earth. pp. 35-36. After escaping from prison, encountering a dying robot and the cries of murdered children, and getting captured and publicly tortured by the Allanze on worldwide television, Emma prevails after Captain Somers rescues her. pp. 45-47, 66-69, 81-86. Meanwhile, oppressed aliens on the exoplanet, including Quittu, overthrow the Allanze and end adherence to Accordance. pp. 82-85. In the finale, Emma and Captain Somers share a kiss. p. 92.

Thematically, the Novels explore people's obsession with media, social media, and technology. In the Novels, first the humans, and later the Allanze, capitalize on humans' susceptibility to media and technology, and use it to control the populace.[6]

## III.   GOVERNING LEGAL STANDARDS

To state a claim for relief, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not

---

[6] *See, e.g.*, *Forecast* p. 57 (Grayson and his supporters "seem to draw them in with their propensity to need to be moved to tears. They use alluring titles to get humanites to ingest their images such as 'This 30 second video will change your life,' or 'What happened next will shock you.' They commit mind crime on the unsuspecting humanites that are drawn into consuming these images."); *Forecast* p. 77 ("many wanting minds of earth are already each a nucleus with disinformation flowing throughout their own neuron-like reeds. Much of this they think they can't do without, yet it's sadly quite destructive to them. [Grayson] is taking a most dubious advantage of this addiction and is working through the medium with evil intentions."); *Exoplanet* p. 55 ("As part of the new tracking and social engineering measures, tablets were being provided to every citizen along with free internet service…. [M]ost were happy to perform the obligatory tasks each day if it meant being able to spend many idle hours playing Accordanceville on their government provided devices.").

do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). The court need not accept as true a "legal conclusion couched as a factual allegation." *Id.* (quoting *Twombly*, 550 U.S. at 555).

"In analyzing the sufficiency of the complaint, [the Court] limit[s] [its] consideration to the well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004). Moreover, "[i]t is well-settled that 'where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment.'" *Bienaime v. Fla. Dep't of Children & Families*, No. 24-CV-23018, 2025 WL 101697, at *2 (S.D. Fla. Jan. 15, 2025) (quoting *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997)); *see SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010) (considering document central to the complaint even though not attached to the complaint); *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999) ("[A] document central to the complaint that the defense appends to its motion to

dismiss is also properly considered, provided that its contents are not in dispute.");
*Sieger Suarez Architectural P'ship, Inc. v. Arquitectonica Int'l Corp.*, 998 F. Supp. 2d 1340,
1345 (S.D. Fla. 2014) (in copyright infringement case, stating: "The Court may also
consult documents that are attached to the motion to dismiss under the
'incorporation by reference' doctrine" if the document is central to the complaint and
undisputed); *Metal Morphosis, Inc. v. Acorn Media Publ'g, Inc.*, 639 F. Supp. 2d 1367,
1373-74 (N.D. Ga. 2009) (in copyright case, considering exhibits attached to
defendant's motion to dismiss, even though these documents were outside the
pleadings, because they were "clearly central to the Plaintiff's infringement claim").

The Eleventh Circuit has "approved of deciding infringement prior to trial,
observing that it 'signals an important development in the law of copyright,
permitting courts to put 'a swift end to meritless litigation' and to avoid lengthy and
costly trials.'" *Cortes v. Universal Music Latino*, 477 F. Supp. 3d 1290, 1296 (S.D. Fla.
2020) (quoting *Lil' Joe Wein Music, Inc. v. Jackson*, 245 F. App'x 873, 876 (11th Cir.
2007)). Numerous district courts within the Eleventh Circuit and other courts outside
the Eleventh Circuit have dismissed copyright infringement claims under Rule
12(b)(6) where, as here, a comparison of the works establishes, as a matter of law,
that the works are not substantially similar in copyrightable expression. *Wooten v.
Netflix, Inc.*, No. 1:20-CV-5166-TCB, 2021 WL 4864744, at *3 (N.D. Ga. May 25,
2021) ("[L]ower courts within this circuit have examined substantial similarity at the
motion-to-dismiss stage, reasoning that to do so is appropriate because the analysis
requires only an examination of the works in question."); *Sieger Suarez Architectural*

*P'ship*, 998 F. Supp. 2d at 1351-52 (granting 12(b)(6) motion to dismiss, with prejudice, where a comparison of the works established that the works were not substantially similar in protectable expression as a matter of law); *Clark v. Alexander*, No. 1:23-CV-1306-MHC, 2023 WL 9235221, at *6-8, 10 (N.D. Ga. Dec. 12, 2023) (same); *Marquardt v. King*, No. 1:10-CV-3946-JEC, 2011 WL 5042054, at *7-8 (N.D. Ga. Aug. 10, 2011) (same); *see also Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 65 (2d Cir. 2010) ("[W]here, as here, the district court has before it all that is necessary to make a comparison of the works in question, we see no error in the district court's decision to resolve the question of substantial similarity as a matter of law on a Rule 12(b)(6) motion to dismiss."); *McDonald v. West*, 138 F. Supp. 3d 448, 460-61 (S.D.N.Y. 2015), *aff'd*, 669 F. App'x 59 (2d Cir. 2016) (granting motion to dismiss where a comparison of the works established that the works were not substantially similar in copyrightable expression as a matter of law); *Marcus v. ABC Signature Studios, Inc.*, 279 F. Supp. 3d 1056, 1071-72 (C.D. Cal. 2017) (same); *Tanikumi v. Walt Disney Co.*, 616 F. App'x 515, 520-21 (3d Cir. 2015) (same).

## IV.   PLAINTIFF HAS NOT, AND CANNOT, STATE A CLAIM FOR COPYRIGHT INFRINGEMENT

### A.   *Because Plaintiff Failed to Register* Exoplanet, *He Cannot Pursue an Action for Copyright Infringement Based on That Book.*

As a threshold matter, a prerequisite to filing an action for copyright infringement is registering the allegedly infringed work with the U.S. Copyright Office. 17 U.S.C. § 411(a); *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 166 (2010).

Because Plaintiff has failed to register *Exoplanet*, he may not sue on any alleged similarities between that book and the Film. In any event, even if the Court were to consider *Exoplanet*, for the following reasons Plaintiff could not prevail on this motion.

**B.    *Because The Works Are Not Substantially Similar in Copyrightable Expression, All of Plaintiff's Copyright Infringement Claims Fail.***

"To state a claim for copyright infringement, 'two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1247-48 (11th Cir. 1999) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991)); *Baby Buddies, Inc. v. Toys R Us, Inc.*, 611 F.3d 1308, 1315 (11th Cir. 2010). To satisfy the second element, a court will enquire into (1) whether the defendant copied portions of the plaintiff's work, and (2) whether those elements of the work "that have been copied are ***protected expression* and *of such importance to the copied work that the appropriation is actionable*.**" *See Cortes*, 477 F. Supp. 3d at 1295-96 (citing *MiTek Holdings, Inc. v. Arce Eng'g Co., Inc.*, 89 F.3d 1548 (11th Cir. 1996)) (citations and brackets omitted, emphasis added); *see also Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1301-02 (11th Cir. 2020).

When, as here, there is no allegation of "direct evidence" of copyright infringement, a plaintiff must prove that: (1) "the defendant had access to the

plaintiff's work[,]"[7] and (2) "the defendant's work is substantially similar to the plaintiff's protected expression." *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir. 1994); *see Cortes*, 477 F. Supp. 3d at 1296 (as to this second prong, "copyright protects only the author's original contributions"). Significantly, copyright protects only a work's expression; ideas are not copyrightable. *Beal*, 20 F.3d at 459 (cleaned up). Neither does copyright protect *scènes à faire*, namely "sequences of events which necessarily follow from a common theme, or incidents, characters, or settings that are indispensable or standard in the treatment of a given topic." *Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters.*, 533 F.3d 1287, 1302 (11th Cir. 2008) (citation and quotation marks omitted); *DuBay v. King*, 844 F. App'x 257, 264 (11th Cir. 2021). Thus, "the plaintiff also must establish specifically that the allegedly infringing work is substantially similar to the plaintiff's work *with regard to its protected elements*." *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1214 (11th Cir. 2000) (internal citations omitted, emphasis in original).

In determining substantial similarity of protected expression, the court will "filter out and disregard the non-protectable elements." *Cortes*, 477 F. Supp. 3d at 1297. Once filtered, the plaintiff must prove substantial similarity as to any remaining protectable material. *Id.* In determining substantial similarity between literary or audiovisual works, courts will consider plot, mood, characterization,

---

[7] For the purposes of this motion only, Netflix assumes, but does not concede, the existence of access. In fact, Defendants vehemently deny that they read Plaintiff's Novels—which were not widely published.

theme, pace, setting, sequence of events, and dialogue. *See Herzog*, 193 F.3d at 1258-62; *Beal*, 20 F.3d at 460-64. An analysis of these elements establishes, as a matter of law, that Plaintiff could not conceivably prove substantial similarity of protected expression.

    ***Plot and sequence of events*.** The Novels tell the story of a high school student who communicates with an alien, learns that Earth might be destroyed in over 2,700 years, announces that information on social media, and, after being involuntarily committed to a psychiatric hospital, becomes U.S. President at age seventeen and without an election. The Novels are not even about a comet, but about "clusters." In the Film, by comparison, there are no extraterrestrial characters or high school students. Rather, the two main characters, Dibiasky and Mindy—both adults and brilliant scientists—discover that a comet will ***imminently*** destroy the world. The pair interact with each other, various governmental entities, and the press to mitigate the impact of the comet. Dibiasky, who discovered the comet, is cast aside and forced to deal with gender-biased, negative press, and Mindy is adversely influenced by the powerful people around him. He even cheats on his wife with an on-air personality. The stories' endings are also strikingly different: in the Novels, there is no cataclysmic event—indeed, any disaster will occur thousands of years in the future—and Emma and her loved ones survive. In the Film, the comet collides with Earth, and Dibiasky, Mindy, and most of humankind are destroyed. Neither Dibiasky nor Mindy becomes president, and in the end, the president dies a horrible (and

humorous) death. The works are remarkably *dissimilar* in plot and sequence of events.

 *Theme.* The works' themes differ markedly and in fact are not even of the same genre. The Film is a satire of government, politics, celebrity, and media indifference to the current major crises facing the world. The comet serves as a metaphor for such an existential threat, and the conundrum that, since the population will not believe it until they "see" it, there is a lack of media coverage and political interest in acknowledging the problem. In contrast, the Novels involve interactions between humans and aliens, space travel, imprisonment on an "exoplanet," and how in each culture, there are good individuals and bad individuals—some of whom care about the future but others who can be manipulated by alien beings and brainwashed through social media and technology. No one in the Novels questions the existence of the deadly clusters. Some are simply opposed to building a bridge to save Earth because they are under the Allanzes' influence and the projected disaster will not occur for thousands of years. The Novels explore people's obsession with media, social media, and technology—which is by humans and then by the Allanze to control the populace.

 *Characterization*. There are no similarities in characterization. Emma is a seventeen-year-old high school student with no apparent deep expertise in science, much less astrophysics. She learns of the clusters only because an alien creature reaches out to her. Dibiasky (played by Jennifer Lawrence), who is in her thirties, is a brilliant doctoral candidate in astronomy. The Complaint's description of Emma

and Dibiasky as "determined female protagonists who face significant challenges in convincing others of an existential threat" (Complaint, ¶ 30) could not be more of an abstract idea. This alleged "similarity" ignores the stark differences in *expression* in each work.

Neither is there similarity between seventeen-year-old President Emma Hayes, a noble character intent on saving humankind, and President Janie Orlean (played by Meryl Streep), a seventy-something, corrupt, philandering politician intent only on saving herself—even at the expense of her son's life.

And of course, because the Film has nothing to do with aliens, there is no counterpart to Srenyi of planet X7gTH5, who serves as a central character in Plaintiff's Novels, or to the evil Allanze. Plaintiff's attempt to compare Srenyi—a tiny alien who resembles a rabbit-beagle-koala—to the Film's handsome scientist Dr. Mindy—portrayed by quintessential leading man Leonardo DiCaprio—because both allegedly "provide scientific authority and credibility for the protagonists' claims" (Complaint, ¶ 30) is ludicrous. Moreover, Dr. Mindy is the *protagonist* of the Film in a way that Srenyi is not.

***Mood.*** Plaintiff's Novels—part science fiction, part conspiracy thriller, part "YA"—center on adolescence, young adulthood, friendship, and the existence of other life in the universe. The humor is tame and adolescent. The Film, by contrast, walks the line between being a truly terrifying disaster movie and one long joke, due to its satire and sometimes over-the-top silliness.

16

*Setting*.  The Novels take place on Srenyi's planet X7gTH5 in another galaxy, on an "exoplanet," in an unassuming Pennsylvania neighborhood where Emma is a student at the Alden Farm High School, in a psychiatric hospital that serves as a prison, and in the U.S. Congress. The Film features scenes at Michigan State University, in the White House, in New York City, and in Dr. Mindy's hometown in Michigan.[8]

*Pace*.  Most of *Forecast* conveys no real sense of urgency—not surprising because the apocalyptic disaster will not take place for over 2,700 years. Rather, the book begins with a contemplative and young-adult story pace and then becomes a conspiracy-political thriller: the future of humankind is not immediately at stake in *Forecast*, but Emma's life is. Assuming *arguendo* that the Court could consider *Exoplanet*, any sense of urgency arises out of Emma's kidnapping and not the need to save the Earth from physical destruction. The Film, by contrast, has a macro sense of urgency, because the planet's destruction is not millennia in the future but imminent.

*Dialogue*.  "[E]xtended similarity of dialogue [is] needed to support a claim of substantial similarity based upon this issue." *Olson v. Nat'l Broad. Co., Inc.*, 855 F.2d 1446, 1450 (9th Cir. 1988). There is none here, and indeed, no such similarities in dialogue are alleged in the Complaint.

In summary, Plaintiff as a matter of law cannot establish substantial similarity of protected expression. For this reason, his copyright infringement claims fail.

---

[8] The White House scenes in *Exoplanet* cannot be considered because that work was not registered (*see* Section IV.A. *supra*), and in any event is *scènes à faire* of a story depicting a U.S. President.

The Complaint nevertheless contains a cherry-picked laundry list of random similarities purportedly giving rise to substantial similarity. As the Eleventh Circuit and other courts have long cautioned, such "lists of similarities are inherently subjective and unreliable, particularly where the lists contain random similarities, and many such similarities could be found in very dissimilar works." *Baby Buddies*, 611 F.3d at 1316 (internal quotations omitted); *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1251 (11th Cir. 2007) (quoting *Herzog*, 193 F.3d at 1257). For example, warnings, threats, public disbelief, travel in a white van, and presidential speeches (*see* Complaint, ¶ 30) are merely abstract, uncopyrightable ideas and *scènes à faire* of disaster movies. Indeed, the Eleventh Circuit has consistently rejected such random lists and found the absence of substantial similarity where two works have shared far more similarity than the works at issue here.[9]

---

[9] *See, e.g.*, *Herzog*, 193 F.3d at 1257-62 (affirming summary judgment for defendants on lack of substantial similarity where both works used flashback sequences to shift from the present to the past; took place in rural, "redneck" towns with histories of racial tension that are dominated by corrupt public officials; made reference to land obtained as a result of massacres; had powerful citizens who conspired to hide the truth of the murders until their secrets are uncovered by the film's protagonists; used the device that deaths were due to foul play instead of natural causes; used the consequences of a prank to set in motion a chain of events and revelations central to the secrets of the town and its residents; recounted the massacre of indigenous people via flashbacks of the witnesses; used a keyring/ring to identify the victims; used information obtained from elderly men at roadside stands to unravel the role of the father in the town's hidden past; had protagonists who were second-generation sheriffs who returned to their hometown and solved a murder; mentioned black Seminole Indians; had evil sheriffs who blackmailed townspeople and were killed; had prominent businesswomen who harbored secrets central to the plot; and had old-timers who help solve the mysteries by telling the protagonists about the town's history); *DuBay*, 844 F. App'x at 264-66 (affirming summary judgment for defendants where both works had characters with similar names, interacted with towers that are integral to time travel, had bird companions, were marked by knightly characteristics, traveled back in time to save a young boy who becomes a gunslinger, wore Western garb, survived a fictionalized Alamo, and used knives).

In light of the foregoing, Plaintiff's copyright infringement claims should be dismissed with prejudice. Dismissal should include the claims for declaratory judgment, contributory copyright infringement, and vicarious infringement, all of which are premised upon a primary infringement—Defendants' alleged misappropriation of the Novels—that Plaintiff as a matter of law cannot establish. *GlobalOptions Servs., Inc. v. N. Am. Training Grp., Inc.*, 131 F. Supp. 3d 1291, 1299-1300 (M.D. Fla. 2015) (for a party to be liable for contributory or vicarious copyright infringement, there must "first be a finding of direct infringement").

## V.     PLAINTIFF'S CLAIMS FOR FALSE ADVERTISING ARE BARRED BY THE U.S. SUPREME COURT'S *DASTAR* OPINION

Plaintiff also alleges false advertising in violation of Section 43(a) of the Lanham Act. Because the gravamen of these claims is that Defendants passed off Plaintiff's work as their own—that is, engaged in "reverse passing off"—the claims are precluded under *Dastar Corp. v. Twentieth Century Fox Film, Corp.*, 539 U.S. 23 (2003).

Reverse passing off occurs when "[a] producer misrepresents someone else's goods or services as his own." *Id.* at 27 n.1. In *Dastar*, the Supreme Court considered whether a claim for reverse passing off existed under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), where a plaintiff alleged misattribution of credit in connection with intangible property. The plaintiff had produced a 1949 television documentary but later failed to renew the copyright in the documentary. *Dastar*, 539 U.S. at 25-26. The defendant Dastar thereafter released the documentary under

different packaging and with slight modifications, without crediting the plaintiff. *Id.*
at 26-27. The plaintiff sued, alleging that such misattribution of credit violated the
Lanham Act. *Id.* at 27. The Court held that a claim for reverse passing off does not
exist where the author of an idea, concept, or communication—as opposed to a
maker of a tangible product—seeks to recover. *Id.* at 31-32. Allowing the plaintiff to
pursue a reverse passing off claim under Section 43(a) of the Lanham Act would
create a "species of mutant copyright law." *Id.* at 34. Thus, the Supreme Court
refused to extend the Lanham Act to claims that were tantamount to copyright
infringement, stating that "[s]uch an extension would not only stretch the text, but it
would be out of accord with the history and purpose of the Lanham Act and
inconsistent with precedent." *Id.* at 32.

The Court decided *Dastar* under Section 43(a)(1)(A), which relates to false
designation of origin. The Complaint apparently purports to raise Section
43(a)(1)(B), governing "false advertising." However, the courts have applied *Dastar*
to claims brought under Section 43(a)(1)(B) where, as here, the alleged false
advertising related to claims of authorship. *See Baden Sports, Inc. v. Molten USA, Inc.*,
556 F. 3d 1300, 1306-07 (Fed. Cir. 2009); *Sybersound Records, Inc. v. UAV Corp.*, 517
F.3d 1137, 1144 (9th Cir. 2008) (excluding false authorship claims from Section
43(a)(1)(B) in order to avoid "overlap between the Lanham and Copyright Acts");
*Kehoe Component Sales Inc. v. Best Lighting Prods., Inc.*, 796 F. 3d 576, 589-90 (6th Cir.
2015); *Copon v. Ho*, No. 6:23-cv-1987-PGB-DCI, 2025 WL 73029, at *11 (M.D. Fla.

Jan. 10, 2025) (*Dastar* barred Lanham Act false advertising claim); *Monilisa Collection, Inc. v. Clarke Prods., Inc.*, No. 6:11-cv-360-Orl-31GJK, 2011 WL 2893630, at *3 (M.D. Fla. July 20, 2011) (same).

Here, Plaintiff's Lanham Act "false advertising" claims all allege that a defendant "made false statements" that the Film "had an original story that was conceived of and written by" a defendant. Complaint, ¶¶ 168, 175, 182, 189, 196. Because these allegations clearly assert claims of false authorship, they are fatally flawed and should be dismissed under *Dastar*.

## VI.    SECTION 301 OF THE COPYRIGHT ACT PREEMPTS PLAINTIFF'S STATE LAW CLAIMS

The Copyright Act preempts "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright." 17 U.S.C. § 301(a). The exclusive rights under the Copyright Act include the right to reproduce the copyrighted work, to prepare derivative works, and to distribute copies to the public. *Id.* § 106; *Lipscher v. LRP Publ'ns, Inc.*, 266 F.3d 1305, 1311 (11th Cir. 2001). A claim is preempted "if the rights at issue (1) 'fall within the subject matter of copyright' set forth in sections 102 and 103 and (2) are 'equivalent to' the exclusive rights of section 106." *Lipscher*, 266 F.3d at 1311. Under the second factor, a claim falling within the subject matter of copyright is preempted unless it requires an "extra element" for recovery that makes the action qualitatively different from a copyright infringement claim. *See Crow v. Wainwright*, 720 F.2d 1224, 1226 (11th Cir. 1983); *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1549 (11th Cir. 1996); *Wicked Grips, LLC v. Badaan*,

No. 8:21-cv-2131-KKM-SPF, 2022 WL 2238864, at *4 (M.D. Fla. June 22, 2022).

Here, Plaintiff's state law claims for unjust enrichment and violation of the Florida

Deceptive and Unfair Trade Practices Act ("FDUTPA"), however styled, all satisfy

both preconditions for preemption.

*First*, books and motion pictures unquestionably fall within the subject matter

of copyright as set forth under Sections 102 and 103. Indeed, Plaintiff himself

confirms this by ***asserting*** claims for copyright infringement in connection of these

same works. The first precondition for preemption is present here.

*Second*, all of Plaintiff's state law claims assert rights equivalent to copyright

and therefore satisfy the second preemption prong. The unjust enrichment causes of

action merely incorporate the prior allegations of copyright infringement and contain

no "extra element" qualitatively different from a copyright infringement claim. The

claim is thus preempted. *See Escal Inst. of Advanced Techs., Inc. v. Treadstone 71, LLC*,

No. 2:23-cv-630-SPC-KCD, 2024 WL 4149864, at *3 (M.D. Fla. Sept. 11, 2024)

(holding state law unjust enrichment claim to be preempted) (citing *Ross v. Apple, Inc.*,

No. 16-61471-CIV-WILLIAMS, 2016 WL 8808769, at *5 (S.D. Fla. Dec. 30, 2016))

("The Copyright Act preempts Ross's unjust enrichment claim, Count 2, because it is

identical to his copyright infringement claims."). Similarly, Plaintiff's FDUTPA

causes of action contain no extra element and are similarly preempted. *See Escal Inst.*

*of Advanced Techs.s, Inc.*, 2024 WL 4149864, at *3-4; *Casa Dimitri Corp. v. Invicta Watch*

*Co. of Am., Inc.*, 270 F. Supp. 3d 1340, 1354 (S.D. Fla. 2017) (FDUTPA claims

preempted "because they are nothing more than a restated copyright infringement claim").

Neither can Plaintiff argue that the FDUTPA claims contain an extra element because they allege deception as to the source of the Film: the *Dastar* opinion invalidates such "congruent" state law claims for alleged failure to credit. *See Tecnoglass, LLC v. RC Home Showcase, Inc.*, 301 F. Supp. 3d 1267, 1275-76 (S.D. Fla. 2017) (holding that in light of *Dastar* and Section 301 of the Copyright Act, FDUTPA claim was preempted); *Williams v. UMG Recordings, Inc.*, 281 F. Supp. 2d 1177, 1183-85 (C.D. Cal. 2003) (state law claim for reverse passing off based on authorship was preempted in light of *Dastar*); *Griffin v. Peele*, No. EDCV 17-01153 JGB (KKx), 2017 WL 8231241, at *7 (C.D. Cal. Oct. 18, 2017) (same); *Copon*, 2025 WL 73029, at *11 (dismissing plaintiff's claims for false designation of origin because such claims "fall squarely within the purview of *Dastar*"); *see also Scanz Techs., Inc. v. JewMon Enters., LLC*, No. 20-22957-Civ-Scola, 2021 WL 65466, at *12 (S.D. Fla. Jan. 7, 2021) ("A plaintiff cannot plead around *Dastar*, by shoe-horn[ing] a claim for improper authorship credit into a false advertising theory.").

*

In light of the foregoing, because Plaintiff has failed to state a claim upon which relief can be granted on any of his claims, the Complaint should be dismissed under Rule 12(b)(6). Moreover, amendment would be futile. *L.S. ex rel. Hernandez v. Peterson*, 982 F.3d 1323, 1332-33 (11th Cir. 2020) (affirming dismissal of complaint

with prejudice; a district court "may deny leave [to amend], *sua sponte* or on motion, if amendment would be futile."). Therefore, dismissal should be with prejudice.

## VII.    CONCLUSION

For the reasons discussed above, the Complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(6) with prejudice.

## <u>LOCAL RULE 3.01(g) CERTIFICATION</u>

Counsel for Netflix certifies that they attempted to confer with counsel for Plaintiff by electronic mail on March 4, 5, 6, and 7, 2025, and scheduled a conference call with Plaintiff's counsel for March 7, however, Plaintiff's counsel did not appear for the scheduled call or respond to a follow-up email attempting to confer. Therefore, counsel for Netflix has been unable to ascertain Plaintiff's position.

Dated: March 10, 2025

Respectfully submitted,

SHULLMAN FUGATE PLLC

By: /s/ Rachel E. Fugate
Rachel E. Fugate
Florida Bar No. 144029
Yelan Escalona
Florida Bar No. 1031564
100 South Ashley Dr., Suite 600
Tampa, FL 33602
Telephone: (813) 935-5098
E-mail: rfugate@shullmanfugate.com
E-mail: yescalona@shullmanfugate.com

and

Robert H. Rotstein (*Pro Hac Vice* pending)
Emily F. Evitt (*Pro Hac Vice* pending)
Rebecca Benyamin (*Pro Hac Vice* pending)
**Mitchell Silberberg & Knupp LLP**
2049 Century Park East, 18th Floor
Los Angeles, CA  90067-3120
Telephone: (310) 312-2000
Facsimile: (310) 312-3100
E-mail:  rxr@msk.com
E-mail:  efe@msk.com
E-mail:  r1e@msk.com

*Counsel for Defendant Netflix, Inc.*